Our second appeal for today is Maria Simon-Antonio against Attorney General Garland, Appeal Number 21-1511. And we'll hear first from Ms. Neal. Good morning, Your Honors. This case arises from a claim of asylum and withholding of removal filed by the petitioners. Petitioners are Congolese indigenous people from Guatemala, among the poorest people in the world. Lead petitioner additionally suffered brutal murder of her father when she was 17 and extreme economic disadvantages which were put into the record at her final hearing and before the Board of Immigration Appeals. The petitioner presented evidence showing harm rising to the level of persecution, but the immigration judge committed legal error in either ignoring or discounting the significance of some of this evidence. The petitioner also presented evidence showing nexus to race and ethnicity, and the immigration judge committed legal error in ignoring and misinterpreting the evidence that was presented. And she presented evidence showing that the government is responsible for or unable or unwilling to protect her from the harm that she suffered. And again, a portion of this evidence was ignored and misrepresented. When she filed her appeal, the Board of Immigration Appeals affirmed and adopted the decision of the immigration judge. However, in doing so, it also applied incorrect legal standards. Could you direct us to a passage in the Board's decision that you think indicates an incorrect standard was applied? Yes, Your Honor. Just one moment. In the instant case, the Board stated that we discern no error in the immigration judge's decision in this regard when it was discussing whether the hardships faced by the petitioner rose to the level of persecution. The Supreme Court has said, most recently just two weeks ago, that the application of a legal standard to facts is a question of law. And this state, this court, has stated that a legal judgment is subject to de novo review. Therefore, and also, I'm sorry, at the Board level, matter of RAF says that the Board of Immigration Appeals should review legal questions. I understand that. My question, however, was looking at this opinion, what language indicates that the wrong standard of review was applied? Well, the Board never states that they're doing de novo review. And to the extent that they say what standard they are using, they say we discern no error. No error. That's what we look for. That's what appellate courts do. They look for error. Right? So I have trouble just from the use of the term error in finding that the Board was applying the wrong standard. It wasn't specific, but it also doesn't seem to indicate that it was using the wrong standard. It appears that they were using clear error by stating that they discern no error. Okay. That's your argument. Okay. Yes. There was another portion where they're discussing nexus, where they do use the term clear error, and it is cited in the brief. Right. That sounds to me like a factual link. Well, the determination of nexus and the determination of whether persecution rises to the level of harm require applying legal standards to the facts that were presented. So when we look at nexus, for example, the motivation or the end goal, which the persecutor was trying to get at, may be a factual determination. But whether the characteristics of the respondents, such as race, ethnicity or particular social group, led to them being targeted in service of that goal is a legal determination. We can see this more clearly in some other cases. For example, in a matter of WGA, I believe it is called, this court found that the persecutors were, their motivation was to find a relative of the respondent. That was their factual motivation. But because that was their motivation, there was a nexus to the fact that he was a family member. He was targeted because he was a family member, but their motivation was... But you're telling us that was WGA, right? Yes. And you're telling us that was a legal determination about what their motives were and whether they tied into the petitioner's family membership? The legal issue was the nexus. In WGA, it was whether the respondent's membership in the family of the person who was being looked for showed nexus to the harm. The factual determination was that the motivation was to find this other family member. And that's the distinction. There's a motivation goal. I really have trouble seeing, those sound to me like two sides of the same coin, same question. Why was this person being mistreated? Well, there's the goal that the persecutor is trying to get at, but who they target in service of that goal shows you whether there is nexus. I think I understand how you are saying our cases are splitting this up. Do you have this same analysis that you do with nexus for future possibilities of torture? Because it seems to me our case law says that's a factual finding as well that we review for clear error. Well, in a convention against torture finding, there's no need to show any nexus. What this court has found... No, I'm just talking about future possibility of torture. We're leaving nexus behind. Future possibility of torture, there is a similar distinction in that the likelihood of the risk is considered a factual determination. However, whether the harm that is going to be suffered would be torture is a legal determination. I cited some case law in my brief regarding that. Is it your view, Ms. Neal, that any members of indigenous minorities within Guatemala would be able to establish persecution based on their ethnicity and thus qualify for asylum in the United States? No, Your Honor. Each person would have to individually show past persecution, which in this case the respondent did through her own testimony and through... But the past persecution, you're relying on widespread circumstances, correct? Yes, but the individual also has to show that they suffered. Even where a large group of people may be targeted for persecution in a country, that doesn't mean that every single one of them is. And there may be some exceptional people who end up not suffering any harm. Perhaps, for example, leaving the country too young to have suffered any harm or being from an exceptionally privileged family. And in this case, we believe the respondent did show it. There is case law in this circuit dating back to the 1990s, starting with Borca v. INS, that severe economic deprivation amounts to, can rise to the level of persecution. And in this case, we are looking at some of the most deprived people in the entire hemisphere. In this case, the immigration judge focused simply on the fact that they had food and shelter, ignoring that they did not have other essentials of life, such as they were unable to afford clothing, schooling, did not have electricity, water, roads, police protection, or other government services. And that was a legal error to ignore the evidence of other deprivation suffered by the respondent and focus merely on the question of shelter and food. Do you want to reserve the rest of your time for rebuttal? Yes, Your Honor. Okay. Thank you, Ms. Neal. We'll hear next from Mr. Shuchard, who is joining us remotely, on behalf of the Attorney General. Thank you, and good morning, Your Honors. I'm Spencer Shuchard for the Attorney General. May it please the Court. This case, I think, is about avoiding the urge to see things that aren't there. There are a lot of issues on the table. Some of them are partially dispositive, but the issue that gets us from A to Z here that disposes of the case is nexus, so I'm going to focus on that. Nexus is a connection between people and events. It's a finding of fact. It's just a finding of what happened. And in this case, Petitioner raised two different kinds of harm, a sort of psychological, emotional harm resulting from a trauma from the murder of her father and then, years later, from some men following her. And she's asking us to see a connection between these things that don't exist. Her theory of nexus here is that, my paraphrasing, is that people were angry at her father and killed him, and those same people are angry at her. But that evidence isn't in the record. What we know is that she doesn't know who killed her father. She wasn't there. She doesn't know why her father was killed. She doesn't know why anyone would kill her father. Many years pass, and then a couple of men begin following her around. She doesn't know the men. She doesn't know if the men know her, if they knew her father, or why they're following her. There's some discrepancies in terms of whether or not they spoke to her, but she finds their presence menacing. That's her nexus. There's no connection there between the two events. There's no connection between the murder of her father and herself or between the men following her and her father's murder. That's not enough to create a nexus. It's other than her imagination. The petitioner does complain in her brief that she wasn't able to find those facts because there wasn't enough police presence. And that may be true. That probably is true. But that doesn't change her burden. She's got to place these facts in the record. We can't just manufacture a reason on her behalf or just believe her. And the same is true for her economic claim. And I'll point out that her theory of nexus here sort of changes over time to the agency. She argues that it's on account of her ethnicity and a sort of hybrid between her ethnicity and her gender. To this court, it appears to me that she's just arguing ethnicity. I don't want to get into the weeds on that except to sort of emphasize that the fact that she can't keep her nexus theory straight sort of highlights how weak this is. But regardless of that, her nexus theory here is that her impoverished conditions are a result of her ethnicity, that the government of Guatemala is essentially targeting people like her. But, again, she's asking us to see things that aren't there. What the record shows that IJ found is that there are poor living conditions in Guatemala and that women seem to have it worse across the board, regardless of ethnicity. But it doesn't show evidence of targeting or of anything other than perhaps that Guatemala is not good at delivering social services to its rural populations. There is actually some evidence of a sort of rural-urban split. And while there is evidence that the rural population is largely indigenous, there's no evidence that that's the reason why rural services are poor. She's asking us to invent that. And we can't. We can't do that on her behalf. And that's the end of her claim. Next, she needs nexus in the past and in the future to make this link. And without nexus, her claim sort of falls apart. I take Petitioner's argument to be with the nexus point that it's really a mixed question of law and fact, which then leads Petitioner to this argument about the standard of review. Why isn't it a mixed question of law and fact? I find this a little hard to argue against because I think, like Judge Hamilton, I don't really understand it. Nexus in every circuit for as long as nexus has been in the INA, the on account of language, has been treated as a question of fact. And that's because it's a finding of fact. Nexus and motive are synonymous. There's no difference between those two. When you find nexus, you're doing the piece of the INA that says on account of or one central reason. You're just asking why this happened. And that's always a finding of fact. Motive is a fact. To bifurcate them would be akin to saying I find that it is raining outside, so I hold that it's raining outside. There's no need to make that argument. As I said in my brief, it's a logical tautology. You don't need to take that step. And the citations to Guerrero, Laspria, and Patel don't make a difference in this case. Those are reviewability cases about applying undisputed facts to legal standards. So when we're talking about, for example, you brought up, Judge Jackson, about finding of future torture. That is a mixed question because it's a bundle of different determinations. There's a finding, a prediction about what will happen, and then a holding about whether what will happen will rise to the level of torture. The same is true for persecution. We have a finding of what happened and then a different holding in terms of is that level of harm enough to be persecution. Here, there's no legal standard for nexus. There's no legal standard for when a person's motive is a motive versus just a stray thought in their head. Analytically, to me, that doesn't make sense. You're just finding facts. You're just finding a connection between two things. So in our view, Guerrero, Laspria, Patel, they don't change anything, nor do they change what the board was supposed to do. The board's standard review is governed by regulation. It finds questions. It reviews facts for clear error. It reviews everything else de novo. And as Your Honors pointed out, or Judge Hamilton pointed out, that appears to be what they did. There's some discrepancies, and sometimes they say error versus clear error. But it makes sense. The area of the decision where they're citing error or clear error, they're talking about not about level of harm, which is a legal determination. In that portion of the decision, they're actually talking about the IJ's predictive findings, about whether her harm is speculative enough, whether it'll happen or not. That's a prediction. That's a finding. So the clear error language there makes sense. The same is true for her complaint about the nexus. Obviously, nexus is a factual determination in every circuit, as I said, and also with her cat claim she has. In the cat claim, the agency talked about error. But what she had raised was acquiescence, which is a factual determination, and likelihood of torture, likelihood versus torture. Does the practice of adopting, the BIA adopting the IJ's report and recommendation in full, and then also not expressly stating the standard of review lead to some confusion and lead to us having to discuss all of this today? Potentially, yes. They do state the standard of review at the beginning of the decision. It's usually the second paragraph in every decision they write. And adopting and affirming is a practice that they've been doing. I think the matter of Bourbon is the case that they use, and I think that's from the 80s. And it's a practice that this court has not disapproved of, and I will cite. I have a citation for you in my hand right here. Yes, the case is Gide, 434F3, 543. In that case, this court said that when the board cites to the standard of review and adopts and affirms the immigration judge, there is no need to say anything else about standard of review. So as long as there's not something obviously wrong with what they're applying, which you might be able to glean perhaps from a case they're citing in support of their reasoning, there's nothing wrong with the standard of review. In this case, if you're going to quibble over whether they say error versus clear error, I think the context of the petitioners, the issues that petitioner was appealing helped to clarify what exactly the board was doing. There's no obvious error, and I think no error at all in what the board did. Mr. Shukar, one question that often comes up in asylum withholding and CAT cases is whether the petitioner would be able to relocate to some other portion of the country to avoid the threat. The immigration judge seems to have made some reference to that, but I don't think I've ever seen a case like this one where the petitioner speaks only a language that is spoken in a very small part of Guatemala and is even illiterate, where it seems like that prospect of relocating is much less likely than it would be in most other cases. I understand what you're asking, Your Honor. And before I answer that, I want to point out that we believe that the CAT claim is waived because she didn't challenge the substance of it, only the standard of review. And even if you don't like the immigration judge's relocation finding, Nexus still kills her case. But that aside, her testimony was that she didn't think she could relocate because she's uneducated and that there is crime. And I think the immigration judge reasonably took that to mean sort of so what? Now, he didn't necessarily take into account her inability to speak a different dialect, but that wasn't really part of why she explained herself. The immigration judge in this case, I think, did a good job of being attentive to the things the petitioner was saying on this relocation issue and on the other issues as well for the economic discrimination claim. She says she had what she needed. That's powerful evidence. The petitioner is admirably candid here. So will it be difficult for her to relocate? Yes. But that's not the standard. And nor is it the standard for us to overturn the agency here. It's are we compelled to find that they're wrong? And I don't believe that the evidence shows that. That's the end of my time. If there are no more questions. All right. Thank you, Mr. Shukar. Thank you. Ms. Neal, rebuttal. Thank you, Your Honor. I would like to touch on a few points raised. You might want to remove your mask if you'd like. Thank you, Your Honors. I would like to touch on a few points that were raised by the opposition. Regarding nexus, I will try one more time to give perhaps a better example where there is a distinction. This court has stated several times in past cases that just because a persecutor's motivation is to get money doesn't mean that they didn't target someone for reasons which are protected characteristics under the act. So there's a difference between the factual motivation of the persecutor and whether there's a nexus to a protected ground. With regard to the argument that whether it was race or race and gender, we are making, and stated in the brief, an intersectional argument that she was targeted. The government forced economic deprivation on her due to her ethnicity, but also she suffered more due to her gender as well. Ms. Neal, can I ask you a question? Does your client speak English? No, Your Honor. As I can tell by the fact, she illegally entered the country in 2015. Is that right? She crossed the border in 2015, yes. Removal proceedings have been basically ongoing since she crossed in a raft, right? I don't know if it was on a raft, but it was at the border. Seven years now or so, we've been in immigration proceedings. Yes, Your Honor. And she speaks only a language that a very small indigenous population in Guatemala can understand? It is very difficult for illiterate people with no education to learn a new language coming to a new country. She is still only fluent in her first language. All right. That's all. All right. Thank you, Ms. Neal. Our thanks to both counsel. The case will be taken under adjournment.